UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


JAMES DICKERSON,                 :
                                 :        Case No. 09-1551
        Plaintiff,               :
                                 :        Philadelphia, PA
    v.                           :        August 3, 2009
                                 :        9:28 a.m.
DESIMONE, INC., et al.,          :
                                 :
        Defendant.               :
----------------------------

          TRANSCRIPT OF ORAL ARGUMENT ON MOTION
        BEFORE THE HONORABLE MARY A. McLAUGHLIN
             UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff:            MATTHEW B. WEISBERG, ESQUIRE
                          Prochniak & Weisberg, P.C.
                          7 South Morton Avenue
                          Morton, PA  19070


For Defendants:           NICOLE GERSON, ESQUIRE
                          1420 Walnut Street
                          Suite 300
                          Philadelphia, PA  19102


Audio Operator:           Raymond Wolf



Transcribed by:           DIANA DOMAN TRANSCRIBING
                          P.O. Box 129
                          Gibbsboro, New Jersey  08026-0129
                          (856) 435-7172
                          FAX:  (856)  435-7124
                          EMAIL:  dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1           THE CLERK:  All rise, Court is now in session, the

2    Honorable Mary A. McLaughlin presiding.

3           THE COURT:  Good morning, everyone.

4           MR. WEISBERG:  Good morning, Your Honor.

5           MS. GERSON:  Good morning, Your Honor.

6           THE COURT:  Please be seated.

7           All right, we are here this morning in the case of

8    James Dickerson vs. Desimone, Inc. and other defendants.  And

9    let me acknowledge everyone who's here.  For the plaintiff,

10   this is Mr. Weisberg, is it, sir?

11          MR. WEISBERG:  Yes, Your Honor.

12          THE COURT:  Good morning.  And is this Mr. Dickerson

13   who's with you?

14          MR. DICKERSON:  Yes, ma'am.

15          THE COURT:  Good morning to you, sir.

16          MR. DICKERSON:  Good morning, ma'am.

17          THE COURT:  And Ms. Nicole Gerson here for the

18   defendants.  Good morning, ma'am.

19          MS. GERSON:  Good morning, Your Honor.

20          THE COURT:  All right.  The purpose of this

21   morning's hearing is for the Court to consider and have oral

22   argument on the defendant's motion to dismiss.  And in looking

23   over the complaint, Mr. Weisberg, I guess the first thing I

24   want to do is make sure that I have federal jurisdiction over

25   this, because there's no diversity, correct, Mr. Weisberg?

1            MR. WEISBERG:  Correct, Your Honor.

2            THE COURT:  Okay.  So as I understand it, your

3    federal jurisdiction is based on a claim under the Federal

4    Equal Credit Opportunity Act and 1983, is that correct?

5            MR. WEISBERG:  Yes, Your Honor.

6            THE COURT:  Okay.  What is the Federal Equal Credit

7    Opportunity Act claim?  I couldn't tell from your complaint.

8            MR. WEISBERG:  That my -- that the dealership,

9    Desimone, was actually the lender, and that they rejected his

10   credit application and never sent him a rejection notice per

11   the Equal Credit Opportunity Act.

12           THE COURT:  Okay.  Is that in your complaint?

13           MR. WEISBERG:  Yes, it is, Your Honor.

14           THE COURT:  Okay, all right.  So is there a

15   particular part of the statute you want to cite me?

16           MR. WEISBERG:  In my complaint, in paragraph 50, I

17   cited 15 U.S.C. Section Civil 1694(e).

18           THE COURT:  Okay. 1994(c)?

19           MR. WEISBERG:  1694(e).

20           THE COURT:  Oh, that's an E, okay.  And so that's

21   the part of the statute that you believe was violated?

22           MR. WEISBERG:  I put et seq, so off the top of my

23   head, this wasn't an issue -- my memory is -- I don't think

24   this was an issue in the motion to dismiss, so --

25           THE COURT:  Well, I guess it's what you wanted a

1  more definite statement on, Ms. Gerson?

2           MS. GERSON:  I believe so.

3           MR. WEISBERG:  Oh actually, I'm sorry.  It's 15

4  U.S.C. Section Civil 1691(d).

5           THE COURT:  1691(d) as in David?

6           MR. WEISBERG:  Yes.

7           THE COURT:  Okay.

8           MR. WEISBERG:  Which is --

9           THE COURT:  And again, tell me what it was that you

10 believe, Desimone is a lender?

11          MR. WEISBERG:  Yes.

12          THE COURT:  And rejected Mr. Dickerson's request for

13 credit without doing what again?

14          MR. WEISBERG:  Without sending him an -- what's

15 called an adverse action notice under ECOA.

16          THE COURT:  Okay.

17          MR. WEISBERG:  And it actually -- another statute is

18 12 CFR, Section symbol, 202.9(a)(2, and that's in my

19 paragraph, in my response to motion to dismiss.

20          THE COURT:  Okay.  You need to put -- you need to

21 have a complaint though, Mr. Weisberg, that very specifically

22 mentions, you know, what part of the statute, especially when

23 I don't have federal jurisdiction otherwise, you know.

24          Now 1983, what is the state -- the state actor here?

25 Why are these defendants state actors?

1            MR. WEISBERG:  This Court, the Third Circuit in

2     Jordan -- this is not an issue for the motion to dismiss, but

3     this is just to answer the Court's question.

4            THE COURT:  Yes, but I have to be sure I have

5     jurisdiction.

6            MR. WEISBERG:  Fair enough.

7            THE COURT:  And I'm not sure --

8            MR. WEISBERG:  Fair enough.

9            THE COURT:  -- of it at this point.

10           MR. WEISBERG:  In the Third Circuit's case of

11    Jordan, and more recently than Jordan, Grillo by the Eastern

12    District, and I believe some cases after that, a private

13    individual can become a state actor if they clothe themselves

14    with the authority of the state.

15           THE COURT:  No, I understand that.  That's basic

16    law.

17           MR. WEISBERG:  Right.

18           THE COURT:  What I'm asking is what -- how did they

19    become a state actor in this case?

20           MR. WEISBERG:  By enlisting the police in the name

21    to arrest my client.  They in essence arrested my client.

22           THE COURT:  So anyone who files a complaint with the

23    police is a state actor?

24           MR. WEISBERG:  Not anyone.  I believe the Jordan

25    case talks about the use of the government, and more -- and my

Colloquy                                           6

1   memory is in the <u>Jordan</u> case it was a confession of judgment,

2   for example, and the Third Circuit held that the confession of

3   judgment itself was not enough.  But after that, there was a

4   execution or a levy on that judgment.

5           And so in this case, it wouldn't be someone who just

6   reports to the police a crime, even if they were involved in a

7   crime.  It would be the more, which is that there was actually

8   Desimone's agent testifying in Court that -- which is similar

9   I think to the <u>Grillo</u> affidavit, but I'm -- again, off the top

10  of my head -- that my client's -- my client was a criminal,

11  when the Court ultimately held, as in the Prosecutor's Office,

12  that that was not the case, as a matter of law.

13          THE COURT:  Mmhmm.  Okay.  Well, it's tricky.  I'm

14  not sure we have state action here just based on the fact that

15  they file a complaint with the police.  I mean there may be

16  other -- obviously there may be abuse of process, there may be

17  malicious prosecution --

18          MR. WEISBERG:  I understand.

19          THE COURT:  -- I'm not suggesting -- I don't know

20  where I am on that.  But I am concerned that I'm not sure that

21  this is a Federal Court case based on that.  But I will, of

22  course, consider it.

23          But going to a broader question.  What is it that

24  you want from the complaint?  Is Mr. Dickerson -- I understand

25  about his arrest.  But putting the arrest aside for the

Colloquy                                    7

1    moment, is Mr. Dickerson out any money or anything?  What is

2    it that you want from this complaint, Mr. Weisberg?

3           MR. WEISBERG:  Well, our primary request under the

4    state law claims, as I think I cited, he's entitled to non-

5    economic damages.  Being imprisoned --

6           THE COURT:  But I'm talking aside from that --

7           MR. WEISBERG:  So only --

8           THE COURT:  Yes.  I'm just focusing on the

9    transaction with the car.

10          MR. WEISBERG:  One second, if you could, I have my

11   client here.

12          THE COURT:  Mmhmm.

13                       (Pause)

14          MR. WEISBERG:  My client -- again, thank you, Your

15   Honor, for that question.  It's unexpected so I had to refer

16   to my client.

17          But my client contends that because of the loss of

18   the use of the truck, he's a handyman, and he couldn't do his

19   job and he lost money that he otherwise would have made.

20          And second of all, he lost the truck.

21          THE COURT:  Okay.  Well, when you say he lost the

22   truck, talk to me about what happened.  He -- did Desimone --

23   I still don't understand what happened with Desimone.  Did

24   Desimone call him or did he go to Desimone to buy a truck,

25   what happened?

1            MR. DICKERSON:  They called --

2            THE COURT:  No, no, no, sir.  No, no, no, you

3   shouldn't speak, because you have a lawyer.

4            MR. WEISBERG:  I'll ask you if I have any questions.

5            THE COURT:  Mr. Weisberg.

6            MR. WEISBERG:  Yes, thank you, Judge.

7            In any event, yes, Desimone had contacted him --

8            THE COURT:  Out of the blue or --

9            MR. WEISBERG:  Yes, out of the blue.

10           THE COURT:  Okay.

11           MR. WEISBERG:  Claiming, and I'm referring to my

12  complaint, on January 12th they contacted him saying he was

13  preapproved for a vehicle of his choice.

14           THE COURT:  Okay, and he didn't have -- he never

15  heard of Desimone before that.  He didn't know anything about

16  them.

17           MR. WEISBERG:  I don't know if he had never heard of

18  them.  They're a somewhat well known dealership.

19           THE COURT:  Okay.  But I mean he had not had any

20  contact with them at all?

21           MR. WEISBERG:  Right.

22           THE COURT:  Okay.  It came out of the blue.  Okay.

23           MR. WEISBERG:  And they advised him that in fact the

24  loan was already secured on his behalf with no money down,

25  that he had to bring proof of income and utility bills --

1            THE COURT:  I can read that, Mr. --

2            MR. WEISBERG:  Okay.

3            THE COURT:  I can read that, Mr. Weisberg, and have

4    read it.  I just wanted to see if you could just tell me sort

5    of what's going on here.  You know, what --

6            MR. WEISBERG:  Well, the --

7            THE COURT:  -- what really does -- why did you file

8    a lawsuit, other than the arrest?  I mean, is there something

9    about this transaction?

10           MR. WEISBERG:  Yes, the transaction is at the least,

11   an unfair trade practice.  It's called -- in the industry it's

12   called a spot delivery.

13           THE COURT:  Okay.

14           MR. WEISBERG:  In the law, it's been called a yo-yo

15   transaction which means that the dealership sells you a car

16   under -- this is very prototypical conditions.  They sell you

17   a car and you leave the dealership with a vehicle, and then

18   they call it back.  So they yo-yo the vehicle back.  And they

19   say well, we weren't able to secure you a loan.  When in fact

20   it is the dealership itself that had already made the loan to

21   you.

22           And what the dealership means to say -- well, they

23   don't mean to say, they mean to hide it, they're saying it, is

24   that we couldn't sell our loan for a profit.

25           And the reason that my client discovered that they

1  couldn't sell the loan for the profit is because he in fact

2  did receive ECOA notices from lenders that they tried to sell

3  it to.

4           THE COURT:  Mmhmm.

5           MR. WEISBERG:  And those lenders said essentially

6  that they had overcharged him for the vehicle, so the -- any

7  assignee of the loan wouldn't be wholly secured.  And that

8  transaction, we would characterize among others, to be an

9  unfair trade practice, separate and apart the fact that they

10  went overboard, when he in fact complied with their demands to

11  return the vehicle.

12           THE COURT:  Okay.  All right.  So, in essence, I

13  mean -- I assume he's glad he didn't do the transaction

14  because he would have been overcharged for the car, or the

15  truck, as far as he's concerned.

16           MR. WEISBERG:  Well, I don't think -- respectfully,

17  Your Honor, I don't think my client would agree with that.  I

18  think my client would say that he agreed to the terms.  If he

19  was the worse off for the bargain, he made an agreement for

20  the bargain. And he's an honest man, and if he got taken in

21  terms of he had to overpay for a pound of roast beef, he had

22  to overpay.  He wanted the truck.

23           THE COURT:  But what does he want now?  He wants

24  economic damages for the loss of the time because he didn't

25  have the car, the truck I mean?

1          MR. WEISBERG:  Yes.

2          THE COURT:  Is there anything else?  Is there

3     statutory damages?

4          MR. WEISBERG:  Yes.

5          THE COURT:  Is there anything else?  Well, that's

6     what I'm asking you.

7          MR. WEISBERG:  All right.

8          THE COURT:  What is it that you want here by this

9     lawsuit?

10         MR. WEISBERG:  Well, my memory again, this isn't in

11    the motion to dismiss, but that the ECOA Act as well as the

12    Unfair Trade Practice Act also enables a statutory penalty.

13         THE COURT:  Mmhmm.

14         MR. WEISBERG:  And in terms of the yo-yo

15    transaction, that's our predominant claims.

16         THE COURT:  Right.  Okay.  All right.  All right,

17    Ms. Gerson, did you bring the full arbitration agreement, or

18    the full document that it's part of?

19         MS. GERSON:  I did.

20         THE COURT:  That's great, ma'am.  Why don't you hand

21    that up.

22         MS. GERSON:  And it was attached to the motion to

23    dismiss.

24         THE COURT:  Oh, I'm sorry.  Oh, the whole thing was?

25         MS. GERSON:  It's only one page.

Colloquy                         12

1          THE COURT:  Oh, it is only one page.  Oh, I thought

2     there was an argument in the motion to dismiss that was more

3     than one page.  Okay.

4                         (Pause)

5          THE COURT:  Okay.  Now, Ms. Gerson, even assuming

6     this arbitration agreement applies, would it apply to the

7     abuse of process claims?

8          MS. GERSON:  Well, I believe the arbitration

9     agreement states that it's from anything that stems from the

10    contract itself, and everything does come from that.

11         I understand what your point is, but --

12         THE COURT:  I mean, it says, let me just read the

13    language and then we can all be on the same page.

14         MS. GERSON:  Sure.

15         THE COURT:  "It is agreed that any controversy

16    arising in connection with this contract may be submitted to

17    binding arbitration."

18         I don't know.  "Controversy arising in connection

19    with this contract."  I mean, if when Mr. Dickerson returned

20    the car and it didn't have, whatever, the rims or whatever on

21    it, and so the people at Desimone got angry and hit him, you

22    know, there was a simple assault or something, that tort

23    wouldn't be covered by this, that tort?

24         MS. GERSON:  Well, I think that gets into a criminal

25    area.  So I think that that's why that might not.  But --

Colloquy                                        13

1         THE COURT:  Well, no, but it would be a civil tort,

2    you can sue someone for assault.  So I guess all I'm -- I'm

3    trying to test the limits of this, you know, because this is a

4    tort.  And sometimes torts are included in arbitration

5    agreements.  Just this -- this at least on its face, arguably

6    at least, and I haven't decided it yet but, seems far afield

7    from that.

8         MS. GERSON:  Let me be perfectly honest about this.

9         THE COURT:  Yes.

10        MS. GERSON:  I honestly can't tell you for sure

11   whether it should or should not.  I think it should because it

12   is still arising from the whole contract.  Because if not for

13   the contract, none of the other stuff would have happened.

14        However, my bigger concern is that the case not be

15   split apart, because there will be a counterclaim in the case,

16   and I just want to make sure that everything is heard at one

17   time, regardless of whether it's here, arbitration, State

18   Court, that's the bigger concern for me.

19        THE COURT:  Okay.  So if I don't find that

20   everything's covered by arbitration, then you'd preferred that

21   I just keep the whole thing?

22        MS. GERSON:  Exactly.  I just think it's easier for

23   the case as a whole, because I'd hate to start separating it

24   out and doing it piecemeal.  It just really makes a mess of

25   it.

1            THE COURT:  Yes.  Now let me ask you.  You asked for

2    more specific, or more definite statements I guess, with

3    respect to some of the claims.  But you haven't actually

4    argued no federal jurisdiction.  What is your view on the --

5    because you want to be in Federal Court, Ms. Gerson, is that

6    what your smile means?

7            MS. GERSON:  I would prefer Federal Court over State

8    Court.

9            THE COURT:  Mmhmm, okay.

10           MS. GERSON:  I mean, that was the main reason that I

11   didn't do that.

12           THE COURT:  Yes, yes.

13           MS. GERSON:  I know it's not the answer you want,

14   but.

15           THE COURT:  No, no, it's not a question of want.  I

16   just want to be sure I understand, you know, everybody's

17   position.

18           Well, okay, ma'am, I didn't mean to direct too much

19   everybody's arguments.  It's just that I did have certain

20   questions.

21           So, talk to me about -- I understand your position

22   on the arbitration agreement, and I'll go back to Mr. Weisberg

23   in a minute on why it shouldn't apply, and if it does apply,

24   whether or not everything's covered by it.  But what are your

25   other points that you made in the motion to dismiss that you'd

1   like to make here?

2            And you can then respond, Mr. Weisberg, of course on

3   the arbitration clause when I get through questioning.

4            MS. GERSON:  Well, if I could first just respond to

5   what Mr. Weisberg said.  Desimone, I do not believe is a

6   lender.  They are a car dealership, they sell cars, they have

7   other people finance them.  They don't do financing

8   themselves.  Some dealerships have what's called "buy here pay

9   here" where they will finance the cars.  Desimone does not do

10  that.  Except in very, very, very, very rare occasions, maybe

11  once every three years they do that.  It's just --

12           THE COURT:  But what is the story -- what does it

13  mean, at least according to Mr. Weisberg, that Desimone

14  themselves were going to loan the money, but then they sent it

15  off and couldn't --

16           MS. GERSON:  No.  That's what I'm saying, I disagree

17  with that.

18           THE COURT:  Okay.

19           MS. GERSON:  They never had any intention of loaning

20  money.  They don't do that.  They are not in the business of

21  lenders. What they do is they arrange for financing.  They do

22  credit applications.  There are signed credit applications, a

23  signed application I believe in the package I gave you, that

24  it was not meant for Desimone.  Desimone forwards it to

25  different banks to try and get their approval to lend the

Colloquy                                    16

1    money.  When they can't get that, they have to basically end

2    the deal.  And they have an agreement for that too, which is

3    also in the papers that I gave you, a conditional delivery of

4    pre-financing addendum, which essentially says that your

5    financing has not yet been approved and if it's not approved,

6    you're going to have to bring the car back.  So people are

7    aware of it.  It's signed.  It's something that buyers are

8    aware of when they do it.

9                 THE COURT:  Mmhmm.

10                MS. GERSON:  Because you can't always get the

11   financing on the spot.

12                THE COURT:  Right, okay.

13                MS. GERSON:  As far as -- I can go through

14   everything in my motion, if you want --

15                THE COURT:  No, that's okay.  Just anything in

16   particular that you wanted to stress.

17                MS. GERSON:  Other than the arbitration agreement, I

18   just thought that -- maybe I'm crazy, but I think that a

19   complaint should have more than one paragraph under a count,

20   other than saying you violated this whole statute.  I want to

21   know exactly what they did to violate and what statute

22   specifically was violated.

23                THE COURT:  Mmhmm.  Ma'am, what's your counterclaim

24   about that you want to bring?

25                MS. GERSON:  The counterclaim will be essentially

Colloquy                                        17

1  theft or conversion for a change in the car, not returning the

2  wheels.

3          THE COURT:  So what happened from your perspective?

4  The rims?  What didn't come back, the rims or the tires?

5          MS. GERSON:  I believe it's like the spinning rims

6  which you sometimes see on the cars, the fancy rims.  They

7  were on the car when he took the car, or the truck, and when

8  he returned it they were returned with cheaper rims, regular

9  plain rims.  And they called him back and they said you know,

10 we need the rims back, and he basically refused to bring them

11 back, and they wanted them and they called the police about

12 it.  And the police investigated.  I honestly cannot tell you

13 yet what happened at Court and why the case was nolo -- I

14 really don't know the answer to that yet.

15         THE COURT:  Okay.

16         MS. GERSON:  Obviously the other things were that

17 the unfair trade practices doesn't really say what that is

18 either, and so I didn't think that really counted.

19         Fraud, if the fraud is about the police complaint,

20 that's not what fraud is.  There's no detrimental reliance,

21 there's nothing in there, so I don't think that fraud is a

22 valid claim.

23         I don't think that the abuse of process of malicious

24 prosecution are valid claims, because again, they were used

25 for exactly the purpose that they're intended.  There was

1    nothing -- it wasn't that they were trying to file a claim

2    that had nothing to do with anything that really happened.  So

3    I don't think the abuse of process and malicious prosecution

4    are valid in this case.

5            The malicious prosecution, there was certainly

6    probable cause here to go to the police, at the very least.

7    And there was certainly no malice intended.

8            And as far as abuse of process, again, they used the

9    legal process to accomplish a purpose which the process was

10   designed.  So I don't think that -- and that's just based on

11   what was written in the complaint as well.

12           I think that -- obviously I always get into the

13   attorney's fees and costs and punitive treble damages, but I

14   think that that's all covered in the motion.

15           THE COURT:  Okay, thank you, Ms. Gerson.

16           Mr. Weisberg, what is the fraud, what do you mean

17   the fraud to be in this case?

18           MR. WEISBERG:  The fraud is the representation that

19   my client was sold a car, when in fact he was not.

20           THE COURT:  Okay.

21           MR. WEISBERG:  And that my client was --

22           THE COURT:  So it's nothing about the arrest?

23           MR. WEISBERG:  Nothing about the arrest.

24           THE COURT:  Okay.

25           MR. WEISBERG:  That it was -- and that he was

1  financed for a car when in fact it appears he was not.  Or at

2  least Desimone contends there was not.

3          THE COURT:  Okay, okay.  And talk to me about the

4  arbitration agreement, please.  Why shouldn't I enforce that

5  on -- with respect to all the claims?  And if not as to all,

6  at least as to some?

7          MR. WEISBERG:  Well, number one, the arbitration

8  agreement itself, we contend is vague and over-broad.  It is

9  agreed that any controversy arising in connection with this

10  contract.

11          The arbitration agreements that I have litigated,

12  maybe even before this Court, refer to something.  It may not

13  be all inclusive or exhaustive, but there's something.  For

14  example, in employment contracts, there would be arising out

15  of a claim of discrimination and wrongful termination, or

16  something, or salary, or something of that nature.

17          THE COURT:  This is not -- this is pretty standard

18  kind of language for an arbitration, I mean, you know, an

19  arbitration agreement.  Sometimes they make even more specific

20  that they cover certain torts, but the language itself is not

21  unusual.  What I'm not -- well, is there any reason other than

22  the language why this agreement isn't valid?  In other words,

23  I understand I have to interpret it, and I don't -- I'm not

24  convinced at this point that it would cover, say the malicious

25  prosecution, the torts, but I'm not sure yet.

1          But putting that aside, is there any reason not to

2     enforce this?

3          MR. WEISBERG:  Well, there are three reasons, Your

4     Honor.

5          First, the provision that each party has to bear

6     their own costs for the arbitration and attorney's fees for

7     the arbitration.  Arbitrations are incredibly expensive, and

8     that is why this, the Third Circuit I believe has held, at

9     least in a class action recently that I don't remember, that

10    when there's a claim for a modest or respectfully to Mr.

11    Dickerson, a smaller claim to subject it to arbitration makes

12    it a cost prohibitive claim.  And that's not the purpose of

13    the law.

14         THE COURT:  You mean because he can't get his

15    attorney's fees back?  Whereas he could in Federal Court?

16         MR. WEISBERG:  Well, no, he might be able to, but

17    certainly the cost.  When you go to arbitration, you have to

18    pay, as I'm sure Your Honor knows, you have to pay, you have

19    to pay whoever it is, a retired judge, a retired magistrate, a

20    lawyer, you have to pay them hourly.  And it can be very,

21    very, very expensive, five to fifteen thousand dollars I would

22    suspect for this kind of claim.  Especially now that there's

23    going to be a counterclaim.

24         We're talking about a case that has non-economic

25    damages as it's main point, and essentially lost wages of a

1   finite period of time and statutory penalties. The cost of the

2   arbitration will overwhelm.

3            THE COURT:  What lost wages?

4            MR. WEISBERG:  Well, Mr. Dickerson contends that

5   because they took his car back, and he does content it was his

6   car, his truck, that he was not able to do his job as a

7   handyman.

8            THE COURT:  The truck that they had sold him, you

9   mean?

10           MR. WEISBERG:  Yes.

11           THE COURT:  Okay.  Not something else.

12           MR. WEISBERG:  Right.

13           THE COURT:  Okay.  Over what period of time?

14           MR. WEISBERG:  I think it was a brief period of

15   time.  Mr. Dickerson?

16           MR. DICKERSON:  It was probably the 12th to the

17   25th, I believe.

18           MR. WEISBERG:  About two weeks, Your Honor.

19           THE COURT:  Okay, all right.  All right.

20           MR. WEISBERG:  And the second reason, Your Honor --

21   well, if I can go back a little, just to show you how cost

22   prohibitive it is.  Even this paragraph which sets forth what

23   I already know, that we have to pay for the arbitrator's

24   photocopying.  I mean, it just shows you that these

25   arbitration forums, while I understand the Supreme Court and I

1    understand that there are a lot of contentions that they're

2    for everybody, this Circuit has said they're not for the

3    smallest of claims.

4              And this is indicative of -- even if it were to be,

5    for example, if Your Honor were to dismiss this whole thing to

6    arbitration, and the defense were to bring a counterclaim for

7    let's say the stolen rims, I don't know how much stolen rims

8    are, but let's say they're 500 bucks.  That would be cost

9    prohibitive to the defendants as well.

10             THE COURT:  Well, they're asking me, so don't worry

11   about --

12             MR. WEISBERG:  Okay, I'm just saying --

13             THE COURT:  Don't worry about Ms. Gerson.

14             MR. WEISBERG:  Okay, fair enough.

15             Second of all, we agree with Your Honor's question

16   that arising from the contract is not an arrest, a

17   prosecution, false testimony.  That even if everything else is

18   subsumed in the arising from the contract, I don't see how

19   reasonably that could have been envisioned when this

20   arbitration agreement was signed by my client.

21             Third, there are federal claims.  The motion itself

22   doesn't cite or discuss the standard for arbitration, it

23   doesn't discuss the interplay between the Pennsylvania

24   Arbitration Act and the Federal Arbitration Act, and it's my

25   belief that the -- I don't know that the Pennsylvania

1   Arbitration -- I don't know, Your Honor, but I don't know that

2   the Pennsylvania Arbitration Act can control federal claims.

3   And I don't know because it hasn't been argued.

4           And so I would say that even if were to arise from

5   let's say breach of contract type of claims, I don't know that

6   it covers ECOA, the failure to give statutory notice.  Is that

7   even arising from the contract, that there's a separate

8   federal law that requires a lender to give a notice of adverse

9   action?  I don't think that arises from the contract.  But I

10  don't know.  That's why we're arguing that there is some

11  ambiguity there.

12          And that's the sum of our argument in terms of the

13  arbitration agreement.

14          Aside from what we also raised in our motion, that

15  my client -- this is a contract of adhesion, there was no

16  separate consideration for it.  And in fact, the underlying

17  contract was nullified.  So how could a arbitration agreement

18  that the defendant contends was part of the contract survive

19  the nullification of the contract, which they nullified.

20          THE COURT:  All right.  I'm sorry, go ahead, sir.

21          MR. WEISBERG:  No, that's all right, I was just

22  hoping to segue into the contention about the more definite

23  statement.

24          THE COURT:  Yes.

25          MR. WEISBERG:  Okay.  I think it's important when

1   you take a look at the plaintiff's complaint to look at the

2   operative facts, the statement of the claims, which is

3   paragraphs 10 through 42.

4          THE COURT:  Yes, but you see, when you bring a big

5   statute as your claim, you do need to tell the Court and the

6   other party which provisions you think -- in other words,

7   someone shouldn't have to go through a big long federal

8   statute to say well, gee, do I think he means this part or

9   that part.  So you do have to tell us which provision of the

10   statute you think is violated.

11          MR. WEISBERG:  Fair enough. And I did put that

12   provision in my response.  I understand that the Court --

13          THE COURT:  Well, I'll probably order you to do a

14   more definite statement --

15          MR. WEISBERG:  Fair enough.

16          THE COURT:  At a minimum.  I mean, I may even

17   dismiss it all, I don't know yet.  All I'm saying is that I do

18   think that we have to know, Ms. Gerson is entitled to know

19   what provisions of the statute that you believe were violated

20   by what.

21          MR. WEISBERG:  Right.

22          THE COURT:  So you do need to be a little more

23   specific I think on that.

24          MR. WEISBERG:  In terms of that ECOA count --

25          THE COURT:  Yes.

1          MR. WEISBERG:  -- it specifically does state,

2     "failing to report to plaintiff the adverse action of its

3     making and then rescinding the loan".

4          THE COURT:  Okay.

5          MR. WEISBERG:  To the extent that I just cited et

6     seq, I don't disagree but I think --

7          THE COURT:  No, I understand.  You can --

8          MR. WEISBERG:  But in terms of the other allegations

9     for more definite statement, I don't see how defense can say

10    oh, I don't know what the abuse of process is.

11         THE COURT:  Well, no, I think she's talking about

12    the statute.  I mean, well, she may also want to know about

13    the abuse of process, but I thought it was -- are there other

14    statutes that are not set forth what provisions have been

15    violated?  I know for the UTPCL --

16         MR. WEISBERG:  Yes.

17         THE COURT:  -- you do have a variety here.

18         MR. WEISBERG:  Yes.

19         THE COURT:  All right, anything further, Mr.

20    Weisberg, before I go back to Ms. Gerson?

21         MR. WEISBERG:  I'm just trying to think what I may

22    have missed.  If I can have a second, Your Honor?

23         THE COURT:  Of course.

24                         (Pause)

25         MR. WEISBERG:  Oh, I wanted to touch upon -- and I

1  think we're now getting into fact disputes.

2            THE COURT:  Mmhmm.

3            MR. WEISBERG:  About the conditional sales

4  agreement, that every buyer of this type of vehicle, in this

5  transaction knows that it's conditional.

6            Well, number one, we contend in our motion that it's

7  inadmissible.

8            But second of all, the Motor Vehicle Sales Finance

9  Act in Pennsylvania requires that all terms of a contract to

10  be in one document, to be in one document.  And has held

11  specifically, these types of conditional delivery and pre-

12  financing addendums to be, an addendum to be not a contract,

13  because it's law violative.

14            But, Your Honor, I hesitate to bring it up because

15  we don't think this is the appropriate stage to be talking

16  about that. But it was brought up so I feel the need to

17  respond.

18            And the second feeling I need to respond, is that

19  I'm looking at the entire packet that Ms. Gerson kindly handed

20  to me, the retail installment sale contract.  I see no lender

21  on this but Desimone.  To the extent that -- and in fact, on

22  every single document it's Desimone.

23            When I bought my car, for example, Your Honor, my

24  retail installment sale contract was prepared by a dealership

25  and said Chase on it.  This doesn't say that.

1       And in any event, to the extent that the defense

2   argues differently, it's the stage they're at that the

3   complaint must rule.

4       THE COURT:  Okay.  Well, Ms. Gerson brought all

5   these documents to me because I had asked to have the whole

6   package because in opposition you said, well, she's only

7   showing you one part of it.  I thought that was what your

8   argument was.

9       MR. WEISBERG:  That is my argument.

10      THE COURT:  Well, if you're making the argument, I

11  have to --

12      MR. WEISBERG:  No, no, no --

13      THE COURT:  I didn't quite finish yet.

14      MR. WEISBERG:  Sorry.

15      THE COURT:  So then I do think I need -- if you want

16  me to look at the whole thing, I need to have the whole thing

17  to look at.  If you don't want me to look at the whole thing

18  and you just want me to look at the arbitration agreement,

19  that's fine.  But I think that's why Ms. Gerson was giving me

20  everything.

21      Is it not, Ms. Gerson?  Did I not ask you to bring

22  this?

23      MS. GERSON:  It was at your request.

24      THE COURT:  Okay, all right.  So I just did that

25  because you had said that's not the whole agreement.  So I

1  thought we should find the whole agreement.

2          Okay, Ms. Gerson, did you have any response, ma'am,

3  to any of Mr. Weisberg's arguments?

4          MS. GERSON:  Yes, please.  And I promise I'll be

5  brief.

6          As far as the fraud is concerned, in paragraph 51,

7  it does state that "it's knowingly and maliciously cost (sic)

8  the accusing plaintiff of a crime and relatedness use of the

9  Philadelphia Police Department and Court system and plaintiff

10 had in fact committed no criminal offense".

11         So it is about the subsequent police report.

12         And as far as fraud is concerned, fraud has to be

13 pled with specificity.  You can't just say they had not

14 secured financing on plaintiff's behalf when they hadn't.  It

15 has to be so and so said this, so and so said this, this

16 wasn't true.

17         As far as the arbitration provision is concerned,

18 the argument that each party has to bear their own cost is not

19 the basis for why the arbitration agreement should not be

20 valid.

21         First of all, this case wasn't brought as an

22 arbitration, so obviously I don't believe Mr. Weisberg thought

23 of it as a nominal amount of money.

24         Besides that, being realistic, I don't think this

25 case is that complicated that it's going to take more than

1    three hours to try the case in front of an arbitration, and I

2    don't think an arbitration panel is going to have tons of

3    records to copy.  In fact, from what I can see, the only thing

4    they're going to copy is their decision.

5           We've already discussed about whether it's arising

6    from the contract, so I won't get into that.

7           As far as the federal claims are concerned, there's

8    no reason at all why an arbitration panel can't hear the

9    federal claims, the state claims, all claims at one time.

10   Everyone who's licensed to practice law in Pennsylvania is

11   also licensed to practice law in Federal Court in

12   Pennsylvania, unless they didn't fill out the paperwork.

13          I don't believe it's a contract of adhesion.  No one

14   forced him to sign anything.

15          And the contract being nullified, in paragraph 1 of

16   the arbitration agreement, the last line, it says, "The

17   arbitration provisions contained herein shall survive the

18   termination or expiration of this contract."

19          Now, going to the argument that it all has to be one

20   document, I think that that's where the definition comes in,

21   whether one document is just one page, or one document is all

22   the documents that make up the whole contract.  I believe that

23   it's all the documents that make up the whole contract.

24          For example, when you sell a car, you have to have

25   an odometer statement in there to say what the odometer reads.

1  Is that not part of the contract because it's on a separate

2  paper?  I don't think anybody would argue that.

3         There is no retail installment sales contract in the

4  documents that I gave you.  I don't know if it's because one

5  doesn't exist or because they haven't found it.  I just know

6  it's not there, and I'm looking into that to get more

7  information.  But there is no retail installment sales

8  contract in the documents that would show the lender, because

9  that's where the lender goes.  There are applications to show

10 that it's going to other people, but there's nothing in the

11 documents that I gave you that show that Desimone is in any

12 way, shape or form the lender in this case.

13        And I think that's it.  Thank you.

14        THE COURT:  Okay.  Anything further, Mr. Weisberg?

15        MR. WEISBERG:  Yes, just very quickly.

16        As to the specificity of the fraud allegation.

17 Defense read part B, which I'm happy to say to the Court I

18 will withdraw, which we're going with the second aspect of our

19 case.

20        THE COURT:  Okay.

21        MR. WEISBERG:  But the first part A said that the

22 defendants had not secured financing when they had.

23        And in terms of the he saids, she saids, I think

24 it's not the law that in Federal Court you're supposed to take

25 a paragraph and pull it out and that's the only thing you look

1   at.  I think the law is that you have to look at the entire

2   complaint.  And the paragraphs are by law incorporated by

3   reference.

4          The he saids, she saids, all throughout, we have

5   quotes in here, we have people in here, we have dates, we have

6   times.  I understand the Court's concern regarding the

7   provision of a federal statute and should a defense have to

8   find the provision.  I understand that concern.

9          I don't understand the defense's concern that it

10  hasn't been -- that anything else hasn't been pleaded with

11  specificity because it has.

12         And in any event, our motion contends that argument

13  waived.  Rules 8 and 9 are not cited at all in the entire

14  brief.  Not much case law was cited at all in the entire

15  brief.  And if the case is so simple, which it may be, I don't

16  see why the complaint itself is not enough notice for the

17  defense to respond, except in the Court saying that ECOA

18  should have been better specified.  I think the facts are in

19  the complaint and specific enough.

20         In terms of the -- and my last point is, in terms of

21  the Motor Vehicle Financing Sales Act, it's the financing

22  documents that must be all one.  I didn't say that there could

23  be a separate odometer disclosure.  It's the finance

24  documents.  That's why this conditional financing addendum is

25  not -- has been held not binding.

1          THE COURT:  Okay.

2          MR. WEISBERG:  All right, thank you, Judge.

3          THE COURT:  Thank you very much.

4          Thank you both very much.  I will take it under

5  advisement.  We're hereby adjourned.

6          THE CLERK:  All rise.

7              (Matter concluded at 10:02 a.m.)

8                      * * * *

## C E R T I F I C A T I O N

I, Sandra Carbonaro, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____

SANDRA CARBONARO

Doman Transcribing & Recording Svcs.    _____

AGENCY                                  DATE